**FAJARDO SHOPPING CENTER, S.E., Plaintiff,**

v.

**SUN ALLIANCE INSURANCE CO. OF PUERTO RICO, INC., Defendant.**

**Civil No. 93–1298(SEC).**

United States District Court, D. Puerto Rico.

Feb. 18, 1998.

■

Luis E. González–Ortíz, & Edward M. Borges, O'Neill & Borges, Hato Rey, PR, for Plaintiff.

Luis A. González–Pérez, Orlando, FL, for Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

This case is before the Court on plaintiff's separate motions for summary judgment (**Docket ## 64, 88**), which were duly opposed (**Docket ## 70, 97**). It is plaintiff's contention that there are no genuine issues of material fact as to either: (a) the applicability of defendant's multi-peril insurance policy to the instant matter, or (b) the amount of damages which defendant owes the shopping center as a result of the fact that there is such coverage. In the alternative, plaintiff moves the Court to rule that there are no genuine issues of material fact as to the liability question. Upon careful examination of the relevant facts, the applicable law and the arguments advanced by both parties, the Court finds that summary judgment should be **GRANTED** as to both issues.

### Factual and Procedural Background [1]

The Fajardo Shopping Center ("FSC"), which is the three-building structure whose damages are being disputed in the instant action, is located in the northeastern municipality of Fajardo, Puerto Rico. For the past twelve years, it has been owned by an entity known as the Fajardo Partnership, a partnership organized under the laws of the state of New Jersey. Its principal building, hereinafter referred to as Building I, is an L-shaped structure, segments of which are leased to more than a dozen retail merchants, including Pueblo Supermarkets, its main tenant. The remaining two structures, Buildings II and III, have throughout the relevant time period been leased to a Firestone and a Kentucky Fried Chicken franchise, respectively.

On December 19, 1988, FSC obtained a special multi-peril insurance policy from defendant Sun Alliance Insurance Company ("SAIC") for the period of December 19, 1988 through April 22, 1991.[2] The policy insured against all risks of direct physical loss to the property, excluding leasehold improvements, subject to the provisions and stipulations made therein.[3] It was the only insurance policy that covered such losses.[4] One of the pertinent exclusions included in the policy was endorsement MP 00 13 (Ed. 01 83), which excepted losses caused by "faulty design, specifications, workmanship, construction or materials if a peril excluded by this policy contributed to the loss at any time."[5] Windstorm was not, however, one of the perils excluded by the policy.[6] In fact, none of the provisions and stipulations made a part of the policy excluded damages caused by a hurricane.[7]

On September 18, 1989, Hurricane Hugo struck the island of Puerto Rico, leaving a significant path of destruction. At maximum

---

1. We have deemed as undisputed those facts which plaintiff presented as such, and which defendant has either admitted or failed to rebut with competent evidence. *See Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); and Pretrial Order of December 12, 1993 (Docket # 15). As plaintiff correctly asserts, defendant is judicially estopped from contesting facts which have already been deemed uncontested in the pretrial order.

2. *See* Plaintiff's Exhibit 11.

3. The insured risks included losses related to business interruption and yard fixtures. *See* Plaintiff's Exhibit 11.

4. *See* Docket # 15, at 15.

5. *See* Defendant's Exhibit A; Docket # 82. Defendant has subsequently argued that another exclusion, contained in the form MP 0013 (Ed. 10 83), is applicable to the instant controversy. Nevertheless, given that defendant has presented MP 0013 (Ed. 01 83), and not the former exclusion, as an Exhibit, and that it has agreed to base its opposition to plaintiff's summary judgment motion on the latter exclusion (*see* Docket # 70, at 5), we shall refrain from addressing the present controversy regarding this matter. *See also* Docket # 15, at 15.

6. *See* Docket # 15, at 15.

7. *Id.*

sustained winds of up to 125 miles per hour, the western part of Hurricane Hugo's eyewall—its most intense area—passed directly through the municipalities of Ceiba, Fajardo and Luquillo, subjecting them to an intense and prolonged battering. Damages to public and private property were estimated at over a billion dollars.[8]

The intense winds did not, however, translate into unusually heavy rainstorms. In fact, San Juan reported only 1.40 inches of rain. Fajardo, one of the hardest hit areas, reported 6.5 inches, and the maximum rainfall amount reported in the Island was found in the municipality of Gurabo and totaled 9.20 inches.[9] In contrast, Hurricane Hortense, which swept the Island in September of 1996, resulted in intense precipitation, especially along the east coast. As much as 22.20 inches of rainfall were recorded at Cayey, followed by 20.5 inches at Naguabo and 20.45 inches at San Lorenzo. Fajardo reported an estimated 7 inches.

The FSC property itself suffered extensive damages.[10] The rainwater, coupled with the intense winds, caused the debris to clog the drain pipes, which in turn, led to extensive ponding on the roof area.[11] This roof, which was made of structural bars called Double-T beams ("DT beams"), collapsed when some of these beams deflected, losing their structural integrity.[12]

Upon plaintiff's request, SAIC advanced FSC the sum of $150,000 to cover emergency repairs and to prevent further damage to the property.[13] Nevertheless, after reviewing plaintiff's estimate of repair costs, SAIC informed plaintiff that it would make a full and complete reservation of all rights afforded under the policy because it had come to the conclusion that most of the damage had been caused by preexistent structural deficiencies in the DT beams, and not by Hurricane Hugo's strong winds.[14]

In a letter submitted to plaintiff shortly thereafter, SAIC maintained that an inspection report submitted by its engineer, Mr. Emiliano Ruiz, demonstrated that the cause of the deflections in the DT beams was not windstorm, but rather the ponding of water due to a faulty and inadequate drainage system.[15] Thus, it agreed to pay exclusively for (1) the removal and replacement of built up roofing and hung ceiling; (2) the removal of debris and clean up; (3) the repair of the air conditioning, electrical system, and store front glass; and finally, (4) the flashings, paint work and parking illumination.[16] Defendant calculated such damages at $96,584.46 after subtracting the advanced amount, the coinsurance and the deductible,

---

8. See *Official Data on Hurricane Hugo* ("Datos oficiales sobre el Huracán Hugo"), the single-page, official report which the National Metereological Service in San Juan, P.R. rendered on Hurricane Hugo; *see also* 35–9 U.S. Department of Commerce, *Climatological Data —Puerto Rico & Virgin Islands* (September 1989); 31–9 U.S. Department of Commerce, *Storm Data* (September 1989).

9. *Id. See also* Defendant's Exhibit F, a National Disaster Survey Report on Hurricane Hugo, which found that Hugo's rapid forward movement greatly reduced its maximum rainfall potential.

10. *See* Docket # 15, at 16; Plaintiff's Exhibits 1, 2, and 14.

11. *See* Plaintiff's Exhibits 37, 38.

12. *See, e.g.,* Plaintiff's Exhibit 38.

13. *See* Docket # 15, at 17.

14. Docket # 15, at 18; Defendant's Exhibit dd. SAIC based this conclusion on statements made by Engineer David McCloskey, who was retained by Pueblo Supermarkets to carry out some repairs. Allegedly, upon examining the building, Engineer McCloskey held that the DT beams had been defective prior to Hugo. *Id.* Yet, as plaintiff correctly maintains, nowhere in this report does McCloskey conclusively hold that such defects, and not Hurricane Hugo, caused the collapse.

It is worth noting that on May of 1989, and upon SAIC's request, Risk Consultants Associates submitted a reinspection report that acknowledged that Building I tenants were suffering from water leaks coming from the roof. *Id.* at 5. It further stated that plaintiff was aware of this situation and had taken measures to seal the holes and cracks, but that most tenants thought the problem would not be solved until the entire roof area was sealed. Notwithstanding the foregoing, the report concluded that the FSC remained "acceptable for property and liability coverages.". *See* Defendant's Exhibit T; Plaintiff's Exhibit 12.

15. Plaintiff's Exhibit 22.

16. *See* Docket # 15, Uncontested Facts, at 19.

and submitted this amount to plaintiff as a proposed proof of loss.[17]

Upon examining defendant's estimate, plaintiff decided to conduct further investigations, which included: (a) a survey conducted by Sousa Surveying Services, which detailed the areas of greatest structural damage; (b) an engineering opinion from structural expert José M. Izquierdo, which affirmed that the collapse of the roof was a direct result of Hugo; (c) an accounting report conducted by CPA Rafael Pérez Villarini, which detailed the amount of rent lost; and (d) a cost estimate rendered by the late Engineer José Carbia, totaling at least $1.5 million.[18] Once it concluded this investigation, plaintiff submitted to defendant its own proposed proof of loss, in the amount of $1,944,356.73.[19] Defendant rejected this estimate through a letter dated November 18, 1992, and resubmitted its previous offer of $96,584.46.[20] Shortly thereafter, plaintiff filed the instant action.[21]

Almost from its inception, this case was fraught with complications. After holding a pretrial and settlement conference on December 10, 1993, the Honorable Héctor Laffitte set this case for trial on January 18, 1994. Upon defendant's request for continuance due to a calendar conflict, the Court rescheduled the bench trial for February 14, 1994. Nevertheless, plaintiff later requested another continuance based on the fact that one of its main experts, Engineer José Carbia, had fallen critically ill. The Court thus moved the bench trial to October 20, 1994.

Shortly thereafter, however, plaintiff was forced to request a second continuance based upon the fact that Mr. Carbia had died and it needed to find another structural engineer; thus the trial date was continued *sine die.* In October of 1994, the case was transferred to the undersigned's chambers.

On December 11, 1995, the undersigned held a status/settlement conference whereby it explored settlement possibilities and denied plaintiff's request for trial by jury.[22] The Court further suggested that it might be necessary to appoint a Special Master to render a report on various complex engineering questions of fact; thus, it ordered the parties to submit the names of three possible candidates.[23] On March 18, 1996, plaintiff informed the Court that, of all the candidates interviewed, only one person—Engineer Efrahim Murati–Martínez—had agreed to participate as a Special Master in an adversarial proceeding such as this one. Thus, plaintiff submitted his résumé to the Court. Since defendant never submitted its own list of candidates, on June 4, 1996, the Court appointed Engineer Murati, a well known and respected professional, as Special Master, and enumerated his rights, powers and responsibilities pursuant to Fed.R.Civ.P. 53.[24] On June 7, 1996—almost six months after the Court requested the names of possible candidates, and three months after plaintiff submitted Engineer Murati's name—defendant filed a motion submitting a candidate for

17. *Id.*

18. *See* Plaintiff's Exhibits 24, 26, 27 and 29.

19. Plaintiff's Exhibit 29.

20. Plaintiff's Exhibit 31.

21. Plaintiff has since conducted further investigations. In 1996, it retained another structural engineer, Mr. Siddiq Khan, to review the roof problems and recommend repair solutions. *See* Plaintiff's Exhibit 38. Mr. Khan concluded, as did the previous experts, that it was Hugo's rainfall and strong winds which caused the damages to the FSC. *Id.* On April 1, 1997, after many revisions, he submitted a cost of repair estimate which totaled $1,546,244.00. *See* Plaintiff's Exhibit 40. In contrast, defendant has merely relied on Engineer Ruiz's 1991 report, as well as other circumstantial evidence of questionable

merit, to support his contention that the damage was caused by inherent defects in the structure. It should be further noted that even Ruiz, when deposed, admitted that there was a danger of collapse after Hugo that did not exist prior thereto. *See* Emiliano Ruiz's Deposition, Special Master's Exhibit # 26, at 93.

22. *See* Docket # 35.

23. *Id.*

24. *See* Docket # 40. Murati was granted, inter alia, the power to informally mediate over these proceedings; to hold separate caucuses with each side, each lawyer or the parties themselves; and to adopt appropriate procedures to accomplish his tasks efficiently and fairly, including the employment of such other persons as he deemed necessary to accomplish his tasks.

Special Master. Its motion was denied as moot.[25]

Immediately following his appointment, Engineer Murati began to study the technical aspects of the case, including, but not limited to, the alleged structural defects in FSC's DT beams, and whether it was those defects that caused the roof to collapse. In an effort to keep both the Court and the parties informed about his efforts, he submitted weekly, and sometimes bi-weekly interim reports.[26] Furthermore, to assist him with his tasks, he hired Engineer Ignacio Martín, a structural engineer, as a consultant.

In July of 1996, Engineer Murati attended the deposition of one of plaintiff's experts, where according to defendant, "it became obvious that the parties had a different understanding as to the duties of the Special Master." [27] Defendant further expressed concern with the fact that Mr. Murati had allegedly already expressed an opinion as to defendant's liability.[28] As a result of these statements, defendant filed a motion requesting that the Court issue guidelines regarding the scope of Engineer Murati's powers as a Special Master, and noted its concern with the fact that Mr. Murati was not qualified to serve as Special Master because he was not a structural engineer.[29] The Court denied defendant's motion on the ground that its June 4, 1996 order appointing the Special Master specifically provided guidelines concerning the Special Master's rights, powers and responsibilities. As to SAIC's concern with the Special Master's qualifications, the Court held that nothing in the record reflected that he was unqualified to render a recommendation on structural engineering issues. In

fact, the Court noted that Engineer Murati's resume and Rennsselear Polytechnic Institute transcript both reflected that he did have experience in this area.[30]

Notwithstanding the Court's order, the controversy regarding the appointment of Special Master Murati escalated shortly thereafter.[31] On April 22, 1997, defendant filed an "emergency motion" requesting that all pending proceedings before the Special Master be stayed, and that the case be scheduled for trial before the Court. Plaintiff opposed the relief sought through a brief filed on April 25, 1997, and defendant replied on April 29, 1997.[32]

Upon examining defendant's renewed objections to the Special Master's performance, the Court ordered Engineer Murati to desist from his previous attempt to mediate over those matters which had been referred to him, and instead requested that he submit a final report and recommendation with his findings thus far.[33] Such a report was to include the Special Master's findings of fact as to the alleged structural deficiencies of the FSC DT beams, and whether it was those deficiencies that caused the collapse and/or damage to the FSC roof. Furthermore, it was to include an assessment as to the cost of repairing such damages. Engineer Murati complied, and immediately proceeded to prepare a report and recommendation with the assistance of Engineer José O. González, a construction cost consultant that he retained.

On April 29, 1997, almost one year after his appointment, the Special Master submitted a report and recommendation. In essence, he concluded that although the FSC roof might have had certain latent defects,

---

**25.** *See* Docket # 48.

**26.** The evidentiary record that Engineer Murati submitted to the Court, which consists of two boxes replete with data, speaks for itself.

**27.** *See* Docket # 51.

**28.** *Id.*

**29.** *Id.*

**30.** *See* Docket # 74.

**31.** *See* Docket # 57.

**32.** *See* Docket # 67, at 1.

**33.** Defendant later objected to the Special Master's "unilateral" decision to render a report without the benefit of a hearing. The Court hereby notes that, in rendering his report and recommendation, Engineer Murati merely followed the Court's instructions. Thus, defendant's remarks to the effect that "a clear indicator of the special master's lack of objectivity is the fact that he was in a position to render a report and recommendation without the evidentiary hearing he himself had scheduled" is simply unwarranted, especially considering that defendant strongly objected to this hearing.

"its future was not at risk." Rather, he held, it was Hurricane Hugo's strong winds, characterized by "downburst forces", that provoked the collapse and/or damage to the roof.[34] He also assessed the total damages owed by defendant at $1,325,045.86.[35]

On May 7, 1997, the Court held a status and/or settlement conference, at which point defendant finally submitted its own construction cost estimate, in the amount of $520,123.05. The Court, caught by surprise at defendant's untimeliness, noted that SAIC's failure to submit this report to the Special Master prior to his submission of a report and recommendation exemplified its lack of good faith. Nevertheless, the Court allowed it and instructed defendant to submit a copy of the cost estimate to the Special Master so that he could take it into consideration and file an addendum to his report. The parties were also granted fifteen days to respond to the Special Master's revised report and recommendation.[36]

On May 22, 1997, plaintiff submitted both a response to the Special Master's report and recommendation and the instant motion for summary judgment.[37] Defendant submitted a response, and subsequently, filed an opposition to plaintiff's motion for summary judgment.[38] In its motion, plaintiff essentially asserted that, in light of the Special Master's findings, there were no genuine issues of material fact involved and thus, summary judgment should be granted in their favor.

Defendant countered this assertion by stating that the Special Master's findings were clearly biased, and that there were genuine issues of material fact involved.

Subsequently, on June 16, 1997, the Special Master submitted a second report and recommendation, where he reiterated his previous findings as to the cost of repairs.[39] He also submitted a separate response to defendant's objections to his report.[40] A hearing on the Special Master's report and recommendation was held on July 9, 1997. At the hearing, the parties did not, however, limit their arguments to their position regarding the Special Master's work thus far. Rather, they took advantage of the opportunity to argue their respective positions regarding the summary judgment motion. The Court, upon listening to both sides, underscored the fact that the Special Master had been retained to review technical testimony and issue a recommendation to the Court.[41]

On that same date, the Court issued an order whereupon it required defendant to coordinate a meeting between its cost consultant, Engineer Miguel Vélez, the Special Master and his cost consultant, to analyze and discuss their respective estimates and try to reach a consensus. On August 15, 1997, after inspecting the FSC site, Vélez revised his prior estimate and concluded that the cost of repairing Building I alone would be at least $912,963.00.[42] On August 19, 1997, Vélez once again met with Murati and his

34.  *See* Docket # 64.

35.  *Id.*

36.  *See* Docket # 63.

37.  *See* Dockets # 64, 65.

38.  *See* Dockets # 67, 70.

39.  *See* Docket # 73.

40.  *See* Docket # 74.

41.  The Court specifically informed counsel for defendant that it:

> appointed a Special Master under Rule 53 to exercise all the powers of a Special Master under Rule 53, which includes making findings of fact and interviewing all of the witnesses, reviewing the technical testimony, viewing the depositions, assisting at the depositions which

> [he] opposed and [the Special Master] was finally able to attend ...

Tr. at 63. The Court further noted that it believed that counsel for defendant:

> ha[d] not taken the opportunity afforded by the Court to go before the Special Master and present all of [his] case. That is what he was appointed for to arrive at findings of fact and conclusions. All legal issues will be passed upon by the Court, the liability issue will be passed upon by the Court. But the Special Master has rendered a report. And he sat and had numerous sessions. He interviewed everyone, he assisted at the depositions, he has a clear record. As far as the Court is concerned, [the defense] apparently ha[s] not taken advantage of the opportunity of going before a Special Master. [It is] now attempting at this stage to ask for a new opportunity.

*Id.* at 65–66.

42.  *See* Plaintiff's Exhibit 70.

consultants and increased his estimate to $1,100,000.00.[43] Plaintiff's expert cost consultant also amended his previous estimate and decreased the final sum to $1,440,427.00, upon reviewing Vélez's report.[44]

On September 18, 1997, the Special Master submitted his final report and recommendation, which incorporated Vélez's, as well as Khan's, revised estimates. He concluded that Building I could be repaired at $1,210,-000.00. Shortly thereafter, on September 30, 1997, plaintiff submitted a supplemental motion for summary judgment and a revised statement of uncontested material facts,[45] which defendant opposed.[46] In this supplemental motion, plaintiff argued that given the recent developments in this case, summary judgment could be granted in its entirety, and not just as to the liability question. Moreover, plaintiff reiterated its previous arguments regarding liability so as to further facilitate the Court's de novo review of the Special Master's liability determinations.

On October 14, 1997, however, defendant submitted yet another objection to the Special Master's final report and recommendation, where he essentially argued that he had been unlawfully excluded from the meeting with Vélez; that his structural expert, Emiliano Ruiz, had been similarly excluded; and that the Special Master's estimates again demonstrated his bias and incompetence. A hearing on these objections was held on October 30, 1997. Upon listening to arguments by both parties, the Court once again praised the Special Master's work in this case and took the matter under advisement.[47] The case is thus, currently ripe for adjudication on both the liability and cost issues.

## Summary Judgment Standards

The First Circuit has recently noted that:

[s]ummary judgment is a means of determining whether a trial is actually required.

It is appropriately granted when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Thus, in order to defeat a properly crafted summary judgment motion, the party opposing it must demonstrate that a trialworthy issue looms as to a fact which could potentially affect the outcome of the suit.

*Serapion v. Martinez*, 119 F.3d 982 (1st Cir. 1997). *See also McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

In determining whether to grant a summary judgment, the Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

Notwithstanding the foregoing, the mere existence of a factual dispute is seldom enough to defeat summary judgment. *United Structures, Inc. v. G.R.G. Engineering, S.E.*, 927 F.Supp. 556, 560 (D.P.R.1996). In those cases where there are factual disputes, summary judgment will be deemed proper if the unresolved facts are not genuine and material to the resolution of the case. *Corporacion Insular de Seguros v. Reyes Munoz*, 849 F.Supp. 126, 132 (D.P.R.1994). For a dispute to be "genuine", "the factual controversy must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side'." *Lynne Woods–Leber v. Hyatt Hotels of Puerto Rico,*

---

43. *See Id.*

44. *See* Plaintiff's Exhibit 68.

45. *See* Docket # 88.

46. *See* Docket # 97.

47. The Court specifically noted that:

the Special Master has complied diligently with the task that the Court gave him in spite of not receiving, in the Court's opinion, all of the cooperation that could have been given him..... [T]he Court considers Mr. Efrahim Murati to be one of the most prestigious engineers in Puerto Rico, recognized by the engineering community as such.

Tr. at 53.

*Inc.,* 124 F.3d 47 (1st Cir.1997). *See also U.S. v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992); *Boston Athletic Assn. v. Sullivan,* 867 F.2d 22, 24 (1st Cir. 1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico,* 27 F.3d 746, 748 (1st Cir.1994).

Furthermore, [on] issues where the non-movant bears the ultimate burden of proof at trial, he may not defeat a motion for summary judgment by relying upon evidence that is "merely colorable" or "not significantly probative." *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993), *referring to Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "To the contrary, the nonmovant must 'present definite, competent evidence to rebut the motion.'" *Pagano,* 983 F.2d at 347, *referring to Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Thus, where the non-movant fails to present evidence that is more than merely colorable, summary judgment will be granted in favor of the movant. *See, e.g., Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

Based on the preceding standard, we must examine the facts, as presented by the parties, to determine whether there are any genuine issues of material fact involved. We find that there are none.

**Applicable Law/Analysis**

*A. The Special Master's Role in these Proceedings*

Rule 53 of the Federal Rules of Civil Procedure provides that in non-jury actions, the Court may refer complex matters of account or difficult damages computations to a Special Master. *See* Fed.R.Civ.P. 53(b). It may also request a Special Master's assistance in other matters, but only upon a showing that exceptional circumstances warrant his intervention. *Id.* The referral of such matters to a Special Master is of course, exceptional in nature, since it usually entails significant expenses and some delay in the proceedings. *Id.* Notwithstanding the foregoing, the Court's ability to do so is not contingent upon the consent of the parties; the Court may act *sua sponte. See* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2603 (2d ed.1995).

Once a Special Master renders a report, his findings are not automatically held to be conclusive. The Court must confirm such findings for them to be valid. District courts should accept a master's findings of fact unless they determine that such findings are clearly erroneous. *See* Charles A. Wright & Arthur R. Miller, *supra* § 2614. "A finding by the master is clearly erroneous when, although there is evidence to support it, the court, after evaluating the entire evidence, is left with the definite and firm conviction that a mistake has been made." *Id.* In reviewing the report, however, courts must keep in mind that a master's legal conclusions, unlike his or her findings of fact, must be reviewed *de novo. Stauble v. Warrob,* 977 F.2d 690 (1st Cir.1992), *referring to Polin v. Dun & Bradstreet Inc.,* 634 F.2d 1319, 1321 (10th Cir.1980); *D.M.W. Contracting Co. v. Stolz,* 158 F.2d 405, 407 (D.C.Cir. 1946), *cert. denied,* 330 U.S. 839, 67 S.Ct. 980, 91 L.Ed. 1286 (1947).

In *Stauble v. Warrob,* 977 F.2d 690 (1st Cir.1992), the First Circuit addressed the "outer boundaries of a district judge's power to refer liability determinations to a special master." *Id.* at 691. The Court noted that "Article III does not require that a district judge find every fact and determine every issue of law involved in a case ... As long as the district court discerns sufficient supporting evidence and is satisfied that the master applied the correct legal standards, it may rely on the master's report as part of its own determinations of liability." *Id.* at 695. What Article III does not allow, and what the First Circuit found wanting in *Stauble,* was the fact that the judicial determination of liability was not "sufficiently independent" from the Special Master's report to render the judgment valid. *Id.* at 696. In that case, the district judge "adopted the master's report without a hearing, without any stated analysis of the evidence, and without any discussion of the master's legal conclusions." *Id.* at 697.

In the instant action, however, the Court referred complex issues of damages as well as specific issues of fact to the Special Master three years into this litigation and upon a clear, if perhaps circumstantial, showing by the parties that such technical assistance would be needed to ascertain the proximate cause and cost issues that were being controverted. The Special Master rendered the following findings and conclusions:

(1) Hurricane Hugo was the immediate cause of the damage to the FSC. The hurricane's strong winds removed sections of built-up felt and gravel where these existed, and this debris clogged the roof drains and led to the temporary ponding of water.[48] Yet this added weight, by itself, was not enough to produce the ensuing damage. The amount of water which could be accumulated in the roof area without overspilling at the edges was limited, so that additional force was necessary to produce the roof's failure. This additional force was provided by the downburst forces of Hurricane Hugo.[49]

(2) Prior to Hurricane Hugo, plaintiff relocated and/or constructed additional roof drains to correct the infiltration of collected water that was affecting commercial areas. Had there been a steeper slope in the roof area, as defendant suggests, the sagging would not have affected the roof drainage. Moreover, after the passage of Hurricane Hugo, the roof remained severely damaged in some sectors and intact in others, a sign that it was the hurricane's extraordinary downburst winds that caused the damage. Furthermore, the experts agreed that prior to 1989, the future of Building I was not at risk.

(3) Taking into consideration the parties' respective cost estimates,[50] as well as the estimate proposed by the Special Master's own cost consultant, the reasonable cost of repairing the mall was estimated as follows:

| | |
|---|---|
| Building I: | $1,210,000.00 |
| Building II (Firestone): | $2,452.92 |
| Building III(KFC): | $58,845.21 |
| Yard Fixtures: | $6,615.27 |
| − Deductibles: | $3,000.00 |
| − Temporary Repair Money: | $71,038.72 |
| = | $1,203,874.68[51] |

Plaintiff accepted the Special Master's report and recommendation even though its recommended cost of repair was over $200,000.00 less that what its own expert suggested.[52] Defendant, on the other hand, objected to the Special Master's report twice: first on the ground that it was trying to "avoid being victimized by the special master's insistence on undertaking judicial powers the U.S. Constitution only confers to Article III judges, in clear contrast with the holdings of the 1st Circuit Court of Appeals in the case *Stauble v. Warrob,* 977 F.2d 690 (1st Cir.1992);" and then on the ground that the exclusion of both, counsel and experts, from the Special Master's meetings, as well as his final estimates, demonstrated his bias toward plaintiff.[53] The Court held two separate hearings on these objections.

We agree with plaintiff's assertion that defendant's opposition is based on a misinterpretation of the *Stauble* decision. SAIC's allegations that the Special Master has deprived it of its Article III right to trial are, if nothing else, unripe, because this Court has yet to pass judgment upon Engineer Murati's report. More importantly, however, under *Stauble,* any possible Article III defects would be cured by examining findings of fact under a clearly erroneous standard, and reviewing any conclusions of

---

**48.** *See* Docket # 62, at 9, 10.

**49.** The Special Master based these findings largely upon Engineer Siddiq Khan's and meteorologist Edwin Núñez's reports on the damage produced by downburst forces. Both Khan and Núñez were retained by plaintiff as experts. Engineer Murati also examined recent revisions to the ASCE–ANSI 7–95 Building Code, which refers to the downburst forces that hurricanes produce.

**50.** The estimates he took into consideration were Khan's final estimate of $1,440,427.00 and Vélez's final estimate of $1,100,000.00.

**51.** *See* Docket # 91. The Special Master appropriately left certain less complex and non-technical matters, such as lost rent, costs, and attorney fees issues, for the Court to determine. *See* Docket # 62.

**52.** *See* Docket # 88, at 26.

**53.** *See* Docket # 67, at 2; Docket # 93.

law *de novo*. What Article III does not allow is the complete abdication of a district judge's responsibilities.

■ Furthermore, as we stated at the hearings held on defendant's objections, we find SAIC's unfortunate allegations regarding the Special Master's "lack of objectivity, neutrality and clear bias in favor of plaintiff" not only false but also unwarranted. As plaintiff asserts, the Special Master "has at all times kept *both* parties fully informed, through formal notices, of every detail relative to the proceedings, to the point of even sending the parties copies of the minutes and conversations at meetings he conducted with the parties' experts." [54] There is simply no evidence to support defendant's barrage of accusations against Engineer Murati, accusations which have even forced the Special Master to have to file a separate motion to defend his work.[55]

As the following sub-sections illustrate, the evidence submitted by plaintiff, defendant and the Special Master himself, examined in light of the applicable law, more than adequately supports the Special Master's findings as to both liability and cost of construction. Based on the foregoing, we believe that the *Stauble* requirements have been more than satisfied. Thus the Court hereby **APPROVES** and **ADOPTS** his final report and recommendation as to both questions.

## B. SAIC's Liability

### 1. Damages to Building I

The parties correctly assert that the instant insurance contract dispute is governed by Puerto Rico law. Nevertheless, the Puerto Rico Supreme Court has recently established that since most of the insurance contracts sold on the Island are modeled after contracts drafted in the United States, both federal and state law principles have considerable persuasive value in Puerto Rico. *PFZ Properties Inc. v. General Accident Insur-*

ance Co., 94 J.T.S 116, at 121. Such is the case with the contract which is at the crux of this controversy. Thus, we will expand our analysis of the applicable law beyond the usual civil law principles.

■ It is a longstanding precept of insurance litigation that the burden of proof lies initially with the insured to demonstrate that a particular loss arose from a covered peril. *Jomark Textiles, Inc. v. Int'l Fire & Marine Insurance Co.*, 771 F.Supp. 577, 579 (S.D.N.Y.1989). Once the insured claimant establishes that the peril is covered, however, the burden will shift to the insurer to demonstrate the limit of its liability. *PFZ Properties*, 94 J.T.S. at 124. This burden is a particularly heavy one, because insurance contracts are usually contracts of adhesion, and its provisions, as well as its exclusions, are liberally construed in favor of the insured. *Meléndez Piñero v. Levitt & Sons of Puerto Rico*, 91 J.T.S. 95; *PFZ Properties*, 94 J.T.S. at 124. This means that, at a minimum, in examining such contracts, courts have to pay particular attention to the parties' intent, and solve any doubts in such a manner that the overall purpose of the agreement is achieved. *López v. Manzano Pozas*, 96 J.T.S. 95, at 1306; *PFZ Properties*, 94 J.T.S: at 124.

■ In the instant case, defendant admitted that the applicable exclusion clause was endorsement MP 00 13 (Ed. 01 83), which excepts from coverage losses caused by "faulty design, specifications, workmanship, construction or materials if a peril excluded by this policy contributes to the loss at any time." [56] Defendant further admitted that windstorm damages were covered by the policy, and that none of the policy's provisions and/or stipulations excluded damages caused by a hurricane.[57] In light of the foregoing, our reading of the preceding exclusion leads us to conclude that even if faulty design, specifications, workmanship, construction or

---

54. *See* Docket # 71, at 7.

55. *See* Docket # 74. Among defendant's most uncalled for allegations are statements that Engineer Murati's findings were "nothing more than speculation", and that, "as a matter of fact, ... [Engineer Murati] was not qualified to make

most of the recommendations contained in his report." *See* Dockets ## 67, 70.

56. *See, e.g.,* Docket # 70, at 5–6.

57. *See, e.g.,* Docket # 15, at 15.

materials were to have caused the loss, plaintiff would still be covered. Nevertheless, defendant contends that coverage should not be extended to the damages suffered by Building I, whose ceiling partly collapsed, because its inherent structural defects were what caused the damages to be so vast. In other words, defendant argues that the proximate or efficient cause of the damages was not the windstorm, but rather, the structure's inherent defects, which led to the ponding of water and ultimately brought about the collapse of the roof.

■ It is an established rule of tort law that for a tortfeasor to be found liable, there must be a causal relationship between the culpable act and the resulting harm. *Cardenas Maxan v. Rodriguez*, 125 D.P.R. 702 (1990). In other words, the culpable act must be the most proximate cause of the harm. *Arroyo Lopez v. ELA*, 126 D.P.R. 682 (1990); *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979). The term "proximate cause" refers to that which ordinarily produces the harm in question, according to general experience. *Cardenas Maxan*, 125 D.P.R. at 710; *Sociedad De Gananciales v. Jeronimo Corp.*, 103 D.P.R. 127, 134 (1974). To determine whether a particular occurrence was the proximate cause of the harm, one must examine whether the harm was to be expected within the ordinary course of events. *Arroyo Lopez*, 126 D.P.R. at 690.

■ When, as in the instant case, it is alleged that concurrent causes are linked to the resulting harm, one must determine which cause is the most "efficient" one. *Valle*, 108 D.P.R. at 697. As Spanish Civil Law commentator Santos Briz maintains, "[w]hen the concurring causes are various, we must deem as decisive that which because of its circumstances causes the harm." *Id.*, *referring to* III J. Santos Briz, *Derecho de Daños* 578 (1973). In doing so, it is not however, necessary to exclude all possible causes or to demonstrate with mathematical precision which one of the causes is determinative. *Dones Jiménez v. Autoridad de Carreteras*, 92 J.T.S. 30 (1992). The principle of causation only requires that the plaintiff show which particular cause most likely caused the harm.

The preceding proximate cause doctrine has been commonly applied to windstorm insurance cases.[58] In *Milan v. Providence Washington Ins. Co.*, 227 F.Supp. 251 (E.D.La.1964), for instance, the Court thought it immaterial that a structural defect in the building may have been a contributing factor to the ensuing loss, and held that "if the damage would not have occurred in the absence of a windstorm, the loss [would be] covered by the policy." *Id.* at 253. *See also Kemp v. American Universal Ins. Co.*, 391 F.2d 533 (5th Cir.1968); *Wilkerson Shoe Co. v. Underwriters Ins. Co.*, 404 F.Supp. 1051 (N.D.Okl.1975). Similarly, in *Goodyear Rubber & Supply, Inc. v. Great Amer. Ins. Co.*, 545 F.2d 95 (9th Cir.1976) the Court held that "[i]t is an established rule of insurance law that where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss." *Id.* at 96, *citing* 5 Appleman, *Insurance Law and Practice* § 3083, at 309. Some courts have gone as far as to say that "where a policy expressly insures against direct loss and damage by one element but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause." *General American Transp. Corp. v. Sun Ins. Office, Ltd.*, 369 F.2d 906 (6th Cir.1966).

---

58. *See* Stephen M. Brent, *What Constitutes "Direct Loss" Under Windstorm Insurance Coverage*, 65 A.L.R.3d 1128 (1976). Brent argues that: it seems to be universally agreed that the wind need not be the only cause of the loss for it to be said that the loss was a direct result of windstorm. It has been held in many cases that the phrase "direct loss" requires only that the windstorm be the proximate cause of the loss, or the proximate or immediate cause, or the proximate and efficient cause.

Brent, *supra* at 2(a). *See also National Hills Shopping Center, Inc. v. Insurance Co. of North America*, 308 F.Supp. 248 (S.D.Ga.1970) ("[t]he gauge by which an insurer's liability is to be measured is whether the windstorm was the proximate, dominant and efficient cause of the loss").

Plaintiff submits that the damage which Building I experienced could not have been caused by faulty design or construction defects. It further maintains that there is uncontradicted evidence that downburst forces from the hurricane were the proximate cause of the resulting damage. But for the hurricane—plaintiffs argue—no damage would have resulted.

To support the preceding contentions, plaintiff proffers the expert testimony of structural experts José Izquierdo and Siddiq Khan, both of whom specifically concluded that the building was properly constructed and that the deflections could not have been the result of faulty design or construction.[59] It further asserts that proof of the foregoing is the fact that the roof had never undergone such severe deflections as a result of prior storms or any other natural phenomena since it was constructed twenty years ago. Plaintiff submits that Siddiq Khan's structural analysis of the roof deflections demonstrated that the deflections existing after Hurricane Hugo went far beyond those to be expected of design and methods of construction.[60]

Plaintiff also makes reference to the ASCE–ANSI Building Code, whose most recent revisions confirm that hurricanes have downburst forces capable of inflicting damages like that suffered by FSC. To put this in perspective, plaintiff submits the deposition testimony of meteorologist José Núñez, who concluded that most probably, downburst forces did occur in the FSC area. Finally, plaintiff maintains that even defendant's expert witness, Engineer Emiliano Ruiz, has been unable to conclusively deny that the hurricane was the proximate cause of the damage; he even admitted that there was a danger of collapse after Hugo that did not exist prior thereto.[61] As discussed previously, the Special Master found this evidence persuasive and adopted it in his findings.

Defendant opposes both plaintiff's and the Special Master's conclusions regarding the proximate cause of the damages suffered by FSC by arguing that there is "overwhelming evidence" which proves that the damage was indeed the result of preexisting structural defects in FSC's DT beams. In support of its contention, it proffers a letter written by Engineer Alfonso Vick in 1974, in which he makes reference to a deflection of up to 14 inches in the DT beams due to water ponding. Defendant maintains that Engineer Vick concluded that because of this overloading, cracking and permanent strain, the DT beams would never return to their original camber position, and that more care would have to be taken in the future through constant inspections to guarantee proper drainage.[62] It submits that this demonstrates that Mr. Vick thought that the building had inherent structural defects.

Defendant further mentions Engineer David McCloskey's deposition testimony, in which he makes reference to a 1980 report in which he found poor drainage and ponding, sagging DT beams, and problems with the expansion joints and leaks of the DT beams that later collapsed. It also refers to Engineer Jose Izquierdo's deposition testimony, "to the effect that the Fajardo Shopping Center roof could have been compromised before Hurricane Hugo."[63] Defendant maintains that Engineer Izquierdo admitted that DT beams "have had a considerable amount of quality control problems, which is why they are rarely used anymore in this jurisdiction."[64] This evidence, he argues, all lends support to his contention that the hurricane was not the proximate cause of the damages to the FSC.[65]

**59.** *See, e.g.* Plaintiff's Exhibits 16, 27, and 38.

**60.** *See* Plaintiff's Exhibit 38.

**61.** *See* Deposition of Emiliano Ruiz, at 93.

**62.** Docket # 70, at 6–7; Defendant's Exhibit B.

**63.** *Id.* at 9.

**64.** *Id.*

**65.** In his surreply, defendant also submits as evidence letters from tenants who complained about roof leaks both prior to and after Hurricane Hugo. *See* Defendant's Exhibits C, D, F, G, I, K, L, M, N, O, P, Q, and V. We note, however, that the issue before the Court is not whether these leaks existed, but rather, whether they were the proximate cause of the damage to the property.

In addition to the foregoing, defendant refers to the deposition testimony of Mr. Jerónimo Ruiz, FSC's manager, in which he alleges that he inspected the mall the day after the hurricane and saw no clogged drains. Moreover, defendant points to meteorologist Edwin Núñez's deposition testimony, where he "admits" that the only way to determine whether downward force winds occurred in a specific area is through a Doppler Radar or through an analysis of the debris in the area in question; and that no such methods were employed in the Fajardo area. Defendant submits that Nuñez admitted that he had "no way of knowing if it occurred [in the Fajardo area] because there is no particular study," and that it was only possible that it could have occurred.[66] Defendant additionally notes that the report to which Nuñez refers in his deposition, the National Disaster Survey Report, demonstrates that "this team of highly qualified experts ... found no evidence of microbursts occurring in the Fajardo area."[67]

Finally, defendant argues that its own expert, Engineer Emiliano Ruiz, "will also include evidence of specific findings which confirm the pre-existent and considerable deflections on the Fajardo Shopping Center roof."[68] He further mentions that "other reliable sources which will be discussed by defendant's expert during testimony at trial [will produce] the same result."[69] This "overwhelming evidence," defendant maintains, "clearly shows that to conclude that downward force winds occurred in the Fajardo area is absurd ..."[70]

Upon careful examination of defendant's contentions, as well as the evidence to which he makes reference, we are unpersuaded that there do exist genuine issues of material fact as to the proximate cause of the damage to FSC. First, we note that Engineer Vick's 1974 letter does not exactly express what defendant purports it maintains. In fact, Vick stated that "the double tees ... even now are just as strong as ever although the positive camber has been removed by the strain of severe overload ..."[71] Moreover, Vick explained that the 14 inch deflection to which defendant makes reference would be reduced to a 1 to 2 inch deflection once the gravel on top of the roof was removed. He also clarified that he did not believe these deflections posed any risk to human life.[72]

We also find that defendant substantially misquoted Engineer McCloskey's deposition testimony. Although, as defendant asserts, McCloskey did find overloading, cracking and permanent strain in the DT beams, he concluded that "the stresses were okay, were adequate, if they had been designed according to drawings ... built according to drawings, which seems to be the case."[73] When specifically asked whether the roof was structurally sound as built and designed, Engineer McCloskey answered in the affirmative.[74]

Defendant, again, misrepresents Engineer José Izquierdo's deposition testimony. It is clear that the only person who stated that the FSC roof "could have been compromised" prior to Hurricane Hugo was defendant's counsel himself. In fact, Izquierdo reacted to defendant's comment by stating that the "roof, to the best of my knowledge, had been inspected before by the insurers, the structure had been inspected and had been accepted as a good structure."[75]

Neither does defendant's mention of Mr. Jerónimo Ruiz's deposition testimony regarding the fact that there were no clogged drains the day after the hurricane support its theory of the case. As his deposition demonstrates, Mr. Ruiz explained that since he saw no clogged drains the day after the hurricane, he concluded it must have been the

66. *Id.* at 14.

67. *Id.*

68. *Id.* at 10.

69. *Id.* at 16.

70. *Id.* at 17.

71. Docket # 67, Appendix 1.

72. *Id.*

73. Docket # 74, at 11 (referring to plaintiff's Exhibit 9).

74. *Id.*

75. Docket # 67, Appendix 2.

strong winds that caused the damage.[76] Finally, as to meteorologist Nuñez's deposition testimony regarding the possibility that downburst forces occurred in the Fajardo area, we once again note that defendant's argument mischaracterizes his testimony. Nuñez in fact concluded that "the damages sustained by the Fajardo Shopping Center were the direct result of the intense and turbulent winds produced by Hurricane Hugo on September 18, 1989."[77] To reach this conclusion, Dr. Nuñez examined the maximum wind speeds and corresponding mean recurrence interval for Hurricane Hugo at different locations in Puerto Rico, including the nearby Roosevelt Roads Naval Base. According to him, these winds "were above the magnitudes specified in the ANSI A58.1–1982 code."[78] More importantly, Nuñez explained in his deposition testimony that despite the lack of availability of a Doppler radar or a debris analysis, it was his expert opinion, based on his study of the National Disaster Survey and the facts of this case, that downburst forces had most probably occurred. Although defendant argues that Nuñez's conclusions are without merit, he has proffered no evidence to support his contention other than the National Disaster Survey Report, a report on which Nuñez relied to reach his conclusion. Based on the foregoing, we agree with plaintiff's contention that Nuñez reasonably relied on his expert opinion and the National Disaster Survey to render his findings.

Finally, we find defendant's brief mention of Engineer Emiliano Ruiz's future testimony at trial insufficient to defeat summary judgment as to the issue of proximate cause. It is an established rule of law that "establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise ... '[C]onclusory allegations, improbable inferences, and unsupported speculation' will not suffice." *Cadle Company v. Hayes,* 116 F.3d 957 (1st Cir.1997) (*quoting*

*Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)).

In sum, upon carefully analyzing the evidence that both parties have submitted for our consideration, we find that plaintiff's evidence—the reports of both of its structural experts and its meteorologist—has conclusively demonstrated that Hurricane Hugo's strong winds were, more likely than not, the proximate cause of the damages to Building I. Other than to argue that various experts reached certain conclusions which the evidence itself demonstrates they didn't reach, defendant has failed to contradict plaintiff's contentions with "definite, competent evidence to rebut the motion." *Pagano,* 983 F.2d at 347. Based upon the foregoing *de novo* review of the Special Master's findings of fact as to the proximate cause issue, the Court hereby **GRANTS** plaintiff's motion for summary judgment as to the liability question.[79]

### 2. Coinsurance Penalty

■ Defendant's policy contains a Coinsurance Clause which provides that "[t]he company shall not be liable for greater proportion of any loss to property covered than the limit of liability under this policy for such property bears to the amount produced by multiplying the actual cash value of such property at the time of the loss by the coinsurance percentage stated in the declarations."[80] A pertinent endorsement further provides that the policy does not cover "[p]roperty which is more specifically covered in whole or in part by this or any other contract of insurance, except for the amount of loss which is in excess of the amount due from such more specific insurance."[81]

Plaintiff contends that Buildings I and II should be appraised at $30.00 per square foot because it merely insured their structure, and not their leasehold improvements. Plaintiff further maintains that Building III should be appraised at a higher value per

---

76. *Id.* at Appendix 3.

77. Docket # 71, Exhibit B–1.

78. Docket # 71, at 18, referring to Nuñez's report.

79. Docket # 62 at 8–10.

80. Plaintiff's Exhibit 11 (Insurance Policy).

81. *Id.* (Endorsement MP 00 13 (Ed. 01 83)).

square foot because its lease contained a turnkey provision, pursuant to which plaintiff agreed to insure all leasehold improvements as well. In support of this contention, plaintiff proffers the lease agreements between FSC and its Building I and II tenants, which provide that the latter would indeed purchase their own insurance for all leasehold improvements.[82]

■ Plaintiff also brings to the Court's attention the fact that the Pretrial Report which both parties submitted in December of 1993 included as an undisputed fact the following data:

Under the terms of the leases, tenants in the L-shaped building ... are responsible for the integrity and maintenance of their own leasehold improvements and insurance therefore ... The policy does not cover property not owned by the landlord, plaintiff herein, including leasehold improvements made by tenants ... Tenants are required to maintain their own insurance, and damage to leasehold improvements from causes not attributable to the Fajardo Partnership, whether fortuitous or not, are for the account and responsibility of the respective tenants ... The tenants have their own insurance policies covering their leasehold improvement ... The lease for the Firestone Store ... contains similar provisions ... The Kentucky Fried Chicken building ... had a different lease, according to which the Landlord provided, paid for, and owned what would otherwise have been the tenant leasehold improvements (i.e. a "turnkey" location), and the Landlord insured them ... Since the plaintiff herein owned the leasehold improvements, the valuation limits under the Policy reflected a higher per-unit insurable value for Building "3".

Despite the preceding admission, defendant now contends that his expert's valuation, which calculated the insurance required for the three buildings at $45.00 per square feet, should stand as the "only true undisputed fact." In support of this contention, defendant makes reference to the Puerto Rico

Civil Code, specifically its Article 263, which provides that permanently adhered fixtures are considered part of the main property.[83]

Although we hereby hold that by agreeing to the preceding "undisputed facts" in the pretrial report which it submitted five years ago, defendant waived any claim that it might have had under this subsection, we believe that defendant has nevertheless, failed to conclusively rebut plaintiff's clearly substantiated contention that it merely insured the structure of Buildings I and II. The section of the Civil Code to which defendant makes reference merely defines, in broad terms, what constitutes an immovable property for purposes of property law. Defendant should have, instead, looked at the provisions of the Code which pertain to Contracts, and which provide that "[i]f the terms of the contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."[84]

Given that defendant has failed to conclusively rebut both the Special Master's and plaintiff's contention that Buildings I and II should be appraised at $30.00 per square foot, and that Building III should be appraised at a higher value per square footage (approx. $45.00), we will hereby **GRANT** plaintiff's motion as to this issue as well. No co-insurance penalty is due.

### 3. *Emergency Repairs*

■ It is undisputed that defendant advanced the sum of $150,000 for emergency repairs. Of this amount, plaintiff used the amount of $104,199.11 to conduct certain repairs to Building I. Upon reviewing a report on emergency repairs which Mr. Jeronimo Ruiz submitted to him early last year, the Special Master noted that plaintiff had used some of this money to pay its own accountants, and subtracted the amounts expended for this purpose as unrelated to emergency repairs. Based upon this data, the Special Master concluded that plaintiff had appropriately spent a total of $94,514.11 in emergency repairs. This left plaintiff with $50,485.89

---

**82.** Plaintiff's Exhibits 49–56.

**83.** *See* 31 L.P.R.A. § 1043.

**84.** 31 L.P.R.A. § 3471.

which, increased by a compound interest of 5% per annum, amounted to $71,038.72. The Special Master further noted that this amount could have been used to repair Buildings II and III, and thus recommended that the Court not allocate any amounts for business interruption as to these buildings.

Plaintiff alleges that these $71,038.72 should be offset by the amount of money which Pueblo Supermarkets, its main tenant, spent in temporary repairs to its locale, i.e. $146,726.00.[85] Plaintiff claims that this type of setoff is appropriate because it arises from the same breach of contract claim which is the subject of this litigation. It further adduces that defendant has actually benefitted from these repairs because by undertaking the repairs on its own, Pueblo substantially reduced plaintiff's subsequent claim for business interruption under the policy. Thus, plaintiff argues, if this offset is not allowed, defendant will be unjustly enriched. Plaintiff maintains that if, on the other hand, the claim is allowed, it will disregard the balance between the $146,726 and the $71,038.72.

To support the preceding contention, plaintiff essentially relies on Article 1149 of the Puerto Rico Civil Code, which provides that "[c]ompensation shall take place when two (2) individuals are mutually creditors and debtors of each other." [86] This, plaintiff asserts,

is essentially the Civil Code equivalent of a setoff.[87] Although plaintiff fails to address whether the requisites for compensation are met in the instant case, we note that they do. Both parties are principally bound to each other; both debts consist of a sum of money; both are currently due; both are determined and demandable; and none of them is subject to retention, or to a suit instituted by a third party.[88]

SAIC essentially opposes the preceding contention on the grounds that the Pueblo setoff is essentially a new claim, and that for the claim to proceed, plaintiff should have to request leave to file an amended complaint.[89] Defendant regards this setoff as nothing but a subterfuge to avoid having to file an amended complaint at this late stage of the proceedings. It further contends that the Special Master erroneously credited certain amounts which plaintiff spent on expert fees as "emergency repairs", and that this amount should under no circumstances be credited as such. Defendant's contentions are nevertheless, entirely unsupported.[90]

The Court is unpersuaded by defendant's conclusory allegations. Setoffs have no purpose other than to "[allow] the convenient simplification of relations between mutually indebted parties." *United Structures of America, Inc. v. G.R.G. Engineering, S.E.*, 9

---

**85.** Plaintiff first mentioned these temporary repairs at a status conference held on May 7, 1997. It is undisputed that Pueblo expended $146,726.00 in temporary repairs. *See* Plaintiff's Exhibit 64. It is also undisputed that plaintiff paid Pueblo for these expenses via rent concessions. *See* Docket # 76.

**86.** 31 L.P.R.A. § 3221. Article 1150 further provides that:

[i]n order that compensation may be proper, it is required:
(1) That each of the persons bound should be so principally, and that he be at the same time the principal creditor of the other.
(2) That both debts consist of a sum of money or, when the things due are perishable, that they be of the same kind and also of the same quality, if the latter should have been stipulated.
(3) That both debts are due.
(4) That they be determined and demandable.
(5) That none of them is subject to any retention or suit instituted by a third person, and of which due notice has been given the debtor.

31   L.P.R.A. § 3222.

**87.** We note that this Court has similarly interpreted these provisions to be the equivalent of a setoff. *See, e.g., United Structures of America, Inc. v. G.R.G. Engineering, S.E.*, 9 F.3d 996, 1000 (1st Cir.1993) ("compensation, like setoff, is primarily a device allowing the convenient simplification of relations between mutually indebted parties.")

**88.** 31 L.P.R.A. § 3222.

**89.** Defendant also argues that this claim should not proceed because it has not been allowed to conduct discovery on it. The Court hereby restates the comments it rendered at the last hearing held on October 30, 1997, whereby it clarified for the record that at no point in time had defendant been precluded from conducting discovery on this matter. *See* Tr. at 18–22.

**90.** In its surreply, defendant merely makes reference to Mr. Jerónimo Ruiz's report, the same report which the Special Master relied on in making his recommendations.

F.3d 996, 1000 (1st Cir.1993). If the requirements for offsetting debts are all met, it makes absolutely no sense to have to require plaintiff to submit an amended complaint, merely to add a supplemental claim which can be easily addressed otherwise. Thus, we will allow plaintiff to offset its claim against defendant's credit.

■ As to defendant's contention that the expert fees should not be counted as emergency repair money, we agree with plaintiff's contention that it was defendant's initial denial of liability which forced it to undergo further investigations prior to submitting a proof of loss. Under these circumstances, we believe that the fees were appropriately paid from emergency repair funds.

Based on the foregoing, the Special Master's recommendation is hereby adopted as our own. The $71,038.72 credit shall be offset by the $146,726.00 which Pueblo undisputably spent on emergency repairs.

## C. Cost of Constructing Building I

Plaintiff's expert, Siddiq Khan, estimated the cost of repairing the damages to Building I at $1,440,427.56. Defendant's construction cost expert, Miguel P. Vélez, rendered a final estimate of $1,100,000.00 after meeting with the Special Master, his cost consultant, and Ignacio Martin, and physically inspecting the FSC. The Special Master's final report and recommendation, which takes into consideration the foregoing estimates as well as the recommendations submitted to him by his own construction cost consultant, José O. González, establishes the cost of construction at $1,210,000.00. Plaintiff has subsequently accepted the amount proposed by the Special Master. Thus, there still remains a difference of $110,000.00 between plaintiff's and defendant's official estimates.

■ Interestingly enough, defendant now opposes the estimate which his own construction cost expert submitted to the Court. SAIC contends that the report is invalid because its structural expert was excluded from the site inspection, even though plaintiffs expert was not. It further contends that

this report includes damages that pre-dated Hugo and were caused by excluded perils. Without these damages, defendant argues, there would be "a considerable discrepancy between the report and recommendation made by the Special Master and the figures set forth by Eng. Vélez." [91]

The Court agrees with plaintiff's contention that defendant is estopped from arguing that its structural expert was excluded from the cost revision process because the Special Master gave him ample time to object to the site inspection and/or require the presence of its own expert. As plaintiff asserts, six days before the site inspection, the Special Master faxed defendant an order which held that "Eng. Miguel P. Vélez [would] be allowed the assistance of a structural engineering consultant for his efficient appraisal of cost relative to Eng. Mohammad Siddiq Khan's Option 3 alternative for repair of the damaged roof." [92] Under these circumstances, if defendant was prejudiced because of his structural engineer's absence, it was through no other fault than its own.

As to the fact that the final report took into consideration damages which should have been excluded under the policy, given that we have already held that defendant is liable for the damages produced by the hurricane, its arguments are once again, without merit. Furthermore, as plaintiff asserts, if defendant had any objections to his own expert's report, it should have presented these objections in a timely fashion, and not two and a half months afterwards.

Based on the foregoing, the Court believes that defendant waived any claims that it may have had as to the final assessment rendered by his own construction cost expert. Moreover, since the applicable law mandates that a Special Master's findings of fact, and especially complex matters of account or difficult damages computations, should be upheld unless clearly erroneous, we hereby adopt his conclusions as to the cost of construction as our own. Upon examining the evidence, we are not "left with the definite and firm con-

---

91. Docket # 97, at 18.

92. Docket # 100, Plaintiff's Exhibit 70.

viction that a mistake has been made." [93] We thus find that the sum of $1,210,000.00 is appropriate.

### D. Cost of Constructing Building II (Firestone)

█ It is undisputed that the damages inflicted to Building II are covered by the policy. Since plaintiff did not propose a particular sum for the repair of this building, the Special Master relied on defendant's proof of loss which, based on an estimate prepared by expert Emiliano Ruiz, showed a loss of $2,023.66 at 1989 construction costs. Using the Means Company Inc. *Building Construction Cost Data* ("Means") to update this estimate to 1997 construction costs, the Special Master calculated the loss at **$2,452.92.**

Defendant contends that perhaps the Means update should not be allowed because plaintiff should have used the money advanced for emergency repairs to repair this building. We agree with plaintiff that it is the debtor that is responsible for the interest accrued on an unpaid debt. Thus, we will deem the Special Master's assessment as to Building Two as undisputed, and adopt it as our own. [94]

### E. Cost of Constructing Building III (Kentucky Fried Chicken)

It is also undisputed that the damages endured by Building III are covered by the policy. Again, the Special Master relied on defendant's proof of loss which, based upon Engineer Ruiz's estimate, presented a loss of $48,547.30 at 1989 construction costs. Using Means, the Special Master calculated the actual loss at $58,845.21. Defendant disputes the use of Means for essentially the same reasons proffered above. We hereby hold, as we did with Building II, that as a debtor, it is defendant who should be responsible for this

interest. Had defendant wished to avoid paying interest on this debt, it should—as plaintiff suggests—have consigned the original amount at the Court.

Based on the foregoing, we shall adopt the Special Master's recommendation as undisputed.

### F. Yard Fixtures

It is undisputed that damages to yard fixtures are covered by the policy. Plaintiff submitted a claim of $7,800 for these fixtures; and defendant submitted a proof of loss of $7,257.60 at 1989 construction costs. Since they both included an estimate of $1,800 for a fence which was not covered by the insurance policy, the Special Master found the amount of $5,457.60 to be a fair appraisal of this loss, which, at 1997 construction costs, was estimated at **$6,615.27.** Defendant does not dispute this amount. Thus, there is no genuine issue of material fact as to the amount due for yard fixtures. The Special Master's assessment is hereby adopted as our own. [95]

### G. Deductible

The Special Master found the $3000 deductible suggested by defendant in its proof of loss to be appropriate. This matter is undisputed, and is hereby adopted as our own.

### H. Issues Not Covered by the Special Master

#### 1. Business Interruption (Lost Rents)

█ The Special Master appropriately refrained from submitting a report and recommendation as to lost rents because he felt they might require a certain amount of legal expertise. Plaintiff originally claimed $77,109.37 in lost rents, as per a report rendered by the accounting firm of Vélez, Semprit,

---

**93.** Charles A. Wright & Arthur R. Miller, *supra* at § 2614.

**94.** There is a difference between claiming that no interest should accrue on an unpaid debt—which has remained unpaid for reasons that are beyond our comprehension—merely because plaintiff could have used the unused portion of the emergency repairs money, and demanding that plaintiff's claim for lost rents not proceed because the

emergency repairs money could have solved that situation. We agree that the latter issue merits our attention, but not the former one.

**95.** Defendant once again proffers its argument that plaintiff should have used emergency repair money to cover these damages. Again, we hold that such interest should not have to be incurred by the creditor.

Nieves & Co.[96] To further support this contention, it submitted evidence of the untenability of many of its locates, through, for instance, letters submitted by some of its tenants.[97] Nevertheless, upon receipt of the Special Master's first report and recommendation—which found that plaintiff had misused certain emergency repairs funds, and that no lost rents should be claimed for Buildings II and III—plaintiff withdrew its lost rents claim for these two buildings. Thus, this claim was reduced to $26,943.37.

Defendant objected to this claim in its original opposition, but failed to address it in its supplemental motions,[98] We will, nevertheless, address its prior objections. Essentially, SAIC contends that plaintiff's claim is "grossly exaggerated," that plaintiff did not act with due diligence in keeping its tenants, and that "[it did] not take a genius to know that a reduction in volume of sales in the Fajardo ... after Hurricane Hugo was expected due to the devastation of the hurricane in the immediate area." [99] And yet defendant has once again, failed to proffer any evidence to support any of the previous contentions. Even the evidentiary record which defendant submitted when filing its surreply fails to submit any evidence to back up its allegations. Based on the foregoing, we will allow plaintiff's claim for lost rents in the amount of $26,943.37 to stand as unopposed.

### 2. Obstinacy

■ Plaintiff maintains that this Court should grant costs, prejudgment interest and attorney fees, as well as the amounts expended in hiring its structural expert Siddiq Khan, because of defendant's refusal to concede the liability and cost findings rendered by plaintiff's two previous experts.

■ As plaintiff correctly points out, the First Circuit has already established that "[i]n diversity cases in which the substantive law of Puerto Rico supplies the basis of the decision, a federal court must give effect to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure." *Dopp v. Pritzker*, 38 F.3d 1239, 1252 (1st Cir.1994). Thus, in order to grant attorney fees in favor of the prevailing party, it must find that the losing party was obstinate, unreasonably adamant or stubbornly litigious, so much so that it wasted time and caused the court and the opposing party unnecessary expense and delay. *Id.*[100]

Puerto Rico courts have previously imposed obstinacy-based attorney fees on insurance companies that unreasonably refuse to settle out of court claims, only to subsequently lose in court.[101] In fact, the standard which they have consistently employed provides that, if a reasonable insurer would have accepted a reasonable offer by the insured before forcing the case to go to court, obstinacy costs will be imposed upon the insurer.[102]

Plaintiff specifically alleges that after Hurricane Hugo struck the Island in 1989, defendant unreasonably refused to settle this claim for over three years, while the property's losses increased and plaintiff was forced to hire more experts and incur in additional expenses. Even after the suit was filed in 1993, and until now, defendant has insisted on asserting that there is no coverage. Its only settlement offers have simply been unreasonable, since they have merely covered a fraction of the damages proposed by plaintiff. Furthermore, after agreeing to the appoint-

96. *See* Plaintiff's Exhibit 26.

97. *See, e.g.,* Plaintiff's Exhibit 61.

98. *See* Docket ## 97, 105.

99. *See* Docket # 70, at 39. It is interesting to note that defendant now seems eager to concede that Hurricane Hugo devastated the area of Fajardo, whereas in the liability discussion he insisted upon minimizing the damages caused by the hurricane in this area.

100. The Puerto Rico Rules of Civil Procedure use the term "temerity" instead. This term has been described as conduct which forces litigation which could have been avoided or which forces the opposing party to engage in unnecessary and costly efforts. *See, e.g. Fernandez v. San Juan Cement,* 118 D.P.R. 713 (1987).

101. *See e.g., Morales v. Automatic Vending Service, Inc.,* 103 D.P.R. 281 (1975).

102. *See Colon v. Municipio De Guayama,* 114 D.P.R. 193, 204–205 (1983).

ment of a Special Master, defendant has objected to his undertakings every step of the way. Plaintiff sums up defendant's litigation strategy as one of "argue and delay."

Defendant's opposition to this claim is merely limited to arguing that it has been diligent in litigating this case, that the evidence clearly proves that it is not liable for the damages caused by Hugo, and that if anyone has been obstinate throughout this litigation, it is plaintiff itself. Yet again, defendant has failed to propound any evidence to demonstrate how, other than by requesting two continuances of the trial for legitimate purposes, plaintiff has in any way contributed to the unreasonable delays in the resolution of this case.

We believe that the record speaks for itself. Defendant has clearly engaged in one dilatory tactic after another, including objecting to every single report rendered by the Special Master, insulting him, making conclusory statements without any support whatsoever, and even arguing that the Court has deprived him of rights which he either waived or did not adequately preserve. Based on the foregoing, we believe that plaintiff's claim for attorney fees and costs should be **GRANTED.** Plaintiff is hereby **GRANTED ten (10) days** to file a memorandum of costs and attorney fees with the Court. Defendant shall be granted **ten (10) days** thereafter to oppose it.

**Conclusion**

Defendant's arguments are, as the First Circuit noted in *United States v. Delgado Figueroa,* 832 F.2d 691, 697 (1st Cir.1987), nothing but "smokescreens without fire." This is clearly a case of insurer liability, caught in the midst of a litigation nightmare which has unfortunately lasted almost five years. For the reasons detailed in this opinion and order, we find that plaintiff's motions should be **GRANTED.** Judgment shall be entered accordingly.

**SO ORDERED.**